LASSER, P.J.T.C.
The executor of the Estate of David M. Darrin (taxpayer) contests the valuation, for transfer inheritance tax purposes, of the life estate in the testamentary marital trust transferred by decedent to his wife. This matter was heard on cross-motions for summary judgment.
*421 The Transfer Inheritance Tax Bureau of the Division of Taxation valued the decedent’s wife’s life estate using a mortality table for females. Taxpayer contends that the use by the bureau of this gender-based mortality table results in invidious and invalid discrimination against women and violates the United States and New Jersey Constitutions.
David M. Darrin died on June 6, 1983 survived by his wife and three adult children. Under the terms of his will a marital trust was created, with income from the trust to be paid to his wife during her lifetime. Upon decedent’s wife’s death, the corpus of the trust is to be distributed among decedent’s issue, either as his wife shall appoint under a power of appointment limited to one or more of a class consisting of decedent’s issue or, if she fails to appoint, as directed in decedent’s will. Under his will, decedent provided that all death taxes be paid by the executor from the residuary estate.
At the time of decedent’s death, his wife was 58 years old. The bureau valued the marital trust pursuant to N.J.S.A. 54:36-2, computing the present value of her life estate interest in the trust, using Internal Revenue Service Publication 723A, “Actuarial Values II, Factors at 6% Involving One and Two Lives,” (Dec. 1970) (hereafter IRS Pub. 723A). Age and gender are the sole factors considered by the bureau in valuing a life estate interest for New Jersey transfer inheritance direct tax purposes.[1] For a female aged 58, the discount factor taken from the separate female table is .65988. For a male aged 58, the discount factor taken from the separate male table is .57778. The parties submitted as part of the record a gender-neutral table, using the methodology employed in the preparation of IRS Pub. 723A and assuming a 6% annual interest rate. This gender-neutral table shows a factor of .61860 for a person aged 58 years. The value of the subject life estate and the resulting tax, using the female table, is *422 substantially greater than the value and tax using the male table or the gender-neutral table.
Prior to 1977, the Transfer Inheritance Tax Bureau used a gender-neutral mortality table. In 1977 N.J.S.A. 54:36-2 was amended to provide that:
In determining the value of a life estate, annuity, or estate for a term of years, the United States Life Tables, after December 31, 1970, Single Life Male 6% and Single Life Female 6%, published by the United States Department of Health, Education and Welfare, Public Health Service, with interest at the rate of 6% per annum, shall be used and shall be effective with respect to estates of decedents dying on or after January 1, 1978.
The United States Life Tables described in the statute do not exist, and therefore the bureau uses IRS Pub. 723A. The United States Department of Health, Education and Welfare published certain tables in December 1964 in Publication 1252, entitled, “United States Life Tables: 1959-61” (hereafter HEW Pub. 1252). IRS Pub. 723A contains certain information taken from HEW Pub. 1252. IRS Pub. 723A was in existence at the time the amendment to N.J.S.A. 54:36-2 was enacted in 1977. In 1983 the Internal Revenue Service ceased using gender-based tables to value life estates and began using gender-neutral tables. Treas.Reg. § 20.2031-7.
Taxpayer has submitted the affidavit of an actuary having 23 years of actuarial experience, which states: “[bjased upon the statistical data underlying the tables contained in IRS Pub. 723A, 80.6% of the females will have the same year of death as 80.6% of the males. Thus, only 19.4% of females live longer than males.” This statement is not controverted by the Director.
The Director contends that gender-based tables are more accurate in valuing the right to receive income for life, and that this greater accuracy justifies the use of a gender-based mortality table in the valuation of life estates.
I.
The mandate of the Equal Protection Clause of the Fourteenth Amendment, that no state shall “deny to any person *423 within its jurisdiction the equal protection of the laws,” requires that all persons similarly situated by treated alike. See City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982) (quoting F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920)).
In Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), the Court, referring to the Equal Protection Clause, stated:
[T]he Fourteenth Amendment does not deny to States the power to treat different classes of persons in different ways ... [It] does, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. [ 404 U.S. at 75-76, 92 S.Ct. at 253-254, 30 L.Ed.2d at 229; citations omitted]
It is the general rule that state laws are entitled to a presumption of validity against attack under the Equal Protection Clause.
Legislatures have wide discretion in passing laws that have the inevitable effect of treating some people differently from others, and legislative classifications are valid unless they bear no rational relationship to a permissible state objective. [Parham v. Hughes, 441 U.S. 347, 351, 99 S.Ct. 1742, 1745, 60 L.Ed.2d 269 (1979)]
Thus, economic or social legislation will be sustained as long as the classification drawn by the statute is rationally related to a legitimate state interest. “[T]he Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.” City of Cleburne, Texas, supra, 473 U.S. at 440, 105 S.Ct. at 3254.
However, not all classifications are entitled to such a deferential standard. Because the Equal Protection Clause was intended as a restriction on state legislative action inconsistent with elemental constitutional principles, the Supreme Court has “treated as presumptively invidious those classifications that disadvantage a ‘suspect class,’ or that impinge upon the exercise of a ‘fundamental right.’ ” Plyler v. Doe, supra, 457 U.S. at 216-17, 102 S.Ct. at 2394-95.
*424 Deference will not be afforded a statute which classifies by race, McLaughlin v. Florida, 379 U.S. 184, 192, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964), alienage, Graham v. Richardson, 403 U.S. 365, 371-372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971), or national origin because:
[t]hese factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others. For these reasons and because such discrimination is unlikely to be soon rectified by legislative means, these laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest. Similar oversight by the courts is due when state laws impinge on personal rights protected by the Constitution. [City of Cleburne, Texas, supra, 473 U.S. at 440, 105 S.Ct. at 3255; citations omitted]
An intermediate standard of review applicable to statutory gender classification has also been recognized by the Supreme Court:
[C]ertain forms of legislative classification, while not facially invidious, nonetheless give rise to recurring constitutional difficulties; in these limited circumstances [the Court has] sought the assurance that the classification reflects a reasoned judgment consistent with the ideal of equal protection by inquiring whether it may fairly be viewed as furthering a substantial interest of the State. [Plyler v. Doe, supra, 457 U.S. at 217, 102 S.Ct. at 2395; footnotes omitted]
This intermediate standard of review of governmental classification was first adopted by the court in Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 456-457, 50 L.Ed.2d 397 (1976). See Note, “Impermissible Purposes and the Equal Protection Clause,” 86 Colum.L.Rev. 1184, 1186, n. 19 (1986). “To withstand constitutional challenge, ... classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives.” Craig v. Boren, 429 U.S. at 197, 97 S.Ct. at 457. See, e.g., Heckler v. Mathews, 465 U.S. 728, 744-745, 104 S.Ct. 1387, 1397-1398, 79 L.Ed.2d 646 (1984); Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982); Orr v. Orr, 440 U.S. 268, 279, 99 S.Ct. 1102, 1111, 59 L.Ed.2d 306 (1979); Califano v. Webster, 430 U.S. 313, 316-317, 97 S.Ct. 1192, 1194-1195, 51 L.Ed.2d 360 (1977).
*425 Legislative classifications based on gender call for a heightened standard of review above the mere rational basis standard because gender generally provides no sensible ground for differential treatment. Mississippi Univ. for Women v. Hogan, 458 U.S. at 724-725, 102 S.Ct. at 3336. “Rather than resting on meaningful considerations, statutes distributing benefits and burdens between the sexes in different ways very likely reflect outmoded notions of the relative capabilities of men and women.” City of Cleburne, Texas, 473 U.S. at 441, 105 S.Ct. at 3255.
Thus, there have evolved three different equal protection tests: the first, a general test, the “rational basis” test; the second, an intermediate test, the “governmental objectives” test, which has been applied in cases involving gender discrimination, and the third, a “strict scrutiny” test, involving legislation which classifies by race, alienage or national origin.
Application of the “governmental objectives” test to gender discrimination was recognized by the New Jersey Supreme Court in Tomarchio v. Township of Greenwich, 75 N.J. 62, 379 A.2d 848 (1977), which dealt with gender-based distinctions under the Worker’s Compensation Act. The Court observed:
[I]t would appear essential to assure equal protection under the Constitution that the purposes of a statutory plan based upon differences in sex be thoroughly and cautiously scrutinized to ascertain the genuine objective of the legislation and that there be a critical evaluation of whether the differentiation based upon sex materially advances the legislative goal ... Thus, in assessing the constitutional sufficiency under equal protection strictures of sex-based classifications, we conceive that the judicial approach must be scrupulous and skeptical, and the court must be satisfied completely that there is an important governmental objective which is substantially advanced by gender-based classification. [at 69, 379 A.2d 848; citation omitted]
The Director asserts that because the classification pertains to taxation, there is a presumption of validity and only the minimal rational basis level of scrutiny is appropriate.
As long as there is no fundamental right or suspect category involved, the United States Supreme Court affords the states great deference as to classifications made in the field of taxa *426 tion. Classification is traditionally the “device for fitting tax programs to local needs and usages in order to achieve an equitable distribution of the tax burden,” McKenney v. Byrne, 82 N.J. 304, 315, 412 A.2d 1041 (1980), quoting Madden v. Kentucky, 309 U.S. 83, 88, 60 S.Ct. 406, 408, 84 L.Ed. 590, 593 (1940), and “members of the legislature necessarily enjoy a familiarity with local conditions which [the Supreme] Court cannot have.” McKenney, 82 N.J. at 316, 412 A.2d 1041, quoting Madden, 309 U.S. at 88, 60 S.Ct. at 408, 84 L.Ed. at 593.
In Wrightstown Bor. v. Medved, 193 N.J.Super. 398, 474 A.2d 1077 (App.Div.1984), the court held that a property tax exemption granted to widows of totally disabled New Jersey war veterans violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution because it does not provide the same exemption to the widower of such a veteran, and therefore constitutes gender discrimination against him and his deceased wife. Judge Brody, writing for the court, stated the applicable test:
‘To withstand constitutional challenge, ... classifications by gender must serve important governmental objectives and must be sustantially related to the achievement of those objectives.’ Craig v. Boren, 429 U.S. 190, 199, 97 S.Ct. 451, 458, 50 L.Ed.2d 397, 407 (1976), reh. den. 429 U.S. 1124, 97 S.Ct. 1161, 51 L.Ed.2d 574 (1977). The burden ‘is on those defending the discrimination to make out the claim to justification____’ Wengler v. Druggists Mutual Ins. Co., 446 U.S. 142, 151, 100 S.Ct. 1540, 1545, 64 L.Ed.2d 107, 116 (1980). [at 402, 474 A.2d 1077]
In Manufacturers Hanover Trust Co. v. United States, 576 F.Supp. 837 (S.D.N.Y.1983), rev’d 775 F.2d 459 (2 Cir.1985), cert. den. 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986), the executor of a decedent’s estate challenged, on Fifth Amendment equal protection grounds, the Internal Revenue Service’s use of a gender-based mortality table to calculate the value, at the date of decedent’s death, of decedent’s reversionary interest in a trust she created during her lifetime. The district court, *427 using the governmental objectives test, determined that the use of gender-based tables invalidly discriminated on the basis of sex, and held for the taxpayer.[2] On appeal, the Second Circuit Court of Appeals, although reversing the district court, applied the same governmental objectives test.[3]
I conclude that the test to be applied in a taxation case is the governmental objectives test, and find that the burden is on the Director to establish that the use of gender-based mortality tables serves important governmental objectives and is substantially related to the achievement of these objectives.
*428 II.
In considering gender-based classification under the Equal Protection Clause, the court must first determine whether the challenged statute does in fact discriminate against one sex. Next, the court must ascertain the State’s objectives in creating the classifications, and finally, the court must determine whether the statute is substantially related to the achievement of those governmental objectives.
A. Does The Statutory Scheme In Fact Discriminate By Treating Men And Women Differently?
Under N.J.S.A. 54:36-2, the value of a life estate is determined by reference to gender-based life expectancy tables. The IRS Pub. 723A figures used by the Division of Taxation reflect the life expectancy of the life tenant based on age and gender, and mathematically adjust the value of the property to reflect its worth to the life tenant in actuarial terms. At virtually every age, the factor for women is higher than for men, indicating an actuarial difference in life expectancies between men and women. This results in a higher value for the life estate and a higher tax liability if the life tenant is a woman than if the life tenant is a man of the same age. Thus, the statutory scheme clearly treats individuals differently based on their gender, and therefore equal protection arguments must be considered.
B. What is the governmental objective served by the use of gender-based mortality tables in valuing life estates?
N.J.S.A. 54:36-2 prescribes the tables to be used in valuing life estates. Prior to 1978, the statute required the use of “The 5% American Experience Table of Mortality,” which was based entirely on age, not gender. In 1977, the Director of the Division of Taxation submitted a proposed amendment to N.J.S. A. 54:36-2, which would require the use of gender-based tables and increase the rate of return at which the values are computed from 5% to 6%. The Director’s proposed amendment became *429 Assembly Bill 2314, which was passed and enacted as L. 1977, c. 219, and became effective July 1, 1978.
Taxpayer contends that the only motive which prompted the Legislature to act was the potential for greater tax revenue. The statement submitted by the Director states:
This bill is designed to require the use of an updated Life Estate Table for Inheritance Tax Purposes. The present table, known as the 5% American Experience Table, is no longer appropriate in view of the extended life expectancy of individuals. The tables are used to determine the value of life estates, annuities or estates for a term of years. The proposed tables are known as the United States Life Table and are in use in 21 states and by the Internal Revenue Service, published by the Department of Health, Education and Welfare.
The new tables provide for a 6% return on investments and an expanded life expectancy for men and women. As a result, vested and contingent remainders will be more accurately valued since based upon modern investment values and should produce a higher value for inheritance tax purposes.
Statement of Director of the Division of Taxation accompanying proposed amendment to R.S. 54:36-2.
Although the increase from 5% to 6% is not challenged in this matter, it is useful to note that this change resulted in increased valuation, and more accurately reflects the then current rates of return which could realistically be achieved in the marketplace. The change to gnder-based mortality tables also resulted in increased valuation and, presumably, increased revenues.
Taxpayer’s contention that the purpose of the amendment was to increase tax revenues does not preclude the court from accepting the Director’s statement at the time of the submission of the bill that an objective is accuracy. In McKenney v. Byrne, supra, the Supreme Court stated: “[W]e are bound, as a matter of constitutional law, to assume any reasonably conceivable state of facts not foreclosed by the record.” 82 N.J. at 319, 412 A.2d 1041.
A most important objective of taxation is to secure uniform and equitable taxation, to assure that each citizen bears his fair share of the tax burden. Princeton Univ. Press v. Princeton, 35 N.J. 209, 214, 172 A.2d 420 (1961). I find that, in adopting gender-based mortality tables, increased *430 revenue was not the sole objective and that accuracy in the valuation of life estates is a valid governmental objective not foreclosed by the record.
C. Is the use of gender-based mortality tables substantially related to the achievement of important governmental objectives?
The Director relies primarily on Manufacturers Hanover Trust Co. v. United States, supra, in which the United States Court of Appeals upheld the use of IRS Pub. 723A, the same gender-based mortality tables here in controversy. The factual basis of Manufacturers Hanover is somewhat different from the subject in that Manufacturers Hanover involved the valuation of decedent’s reversionary interest in an inter vivos trust created by decedent. The Internal Revenue Code provides that if the decedent’s reversionary interest exceeds 5% of the gross estate, it is includable in the decedent’s gross estate; otherwise, it is not. The gender-neutral table valued the decedent’s interest at less than 5%. The female table valued it at over 5%.
The court of appeals held that classification by gender serves an important governmental objective—accuracy in valuing a reversionary interest. The court held that gender classification promotes equality and fairness in imposing the tax burden, although the calculations treat similarly-situated men and women differently and classification burdens the estate in a way that it would not if gender were ignored. In reaching this conclusion, the court commented: “[wjhile there is no mechanical test for determining whether or not a practice satisfies the substantial relationship test, case law does make it clear that at least four particular matters must be explored and weighed: (1) aggregate impact on class; (2) demeaning generalizations; (3) stereotyped assumptions; and (4) flawed use of statistics.” Manufacturers Hanover, 775 F.2d at 465.
The court found that demeaning generalizations and stereotyped assumptions were not issues in the case. Therefore, the court’s analysis, based on aggregate impact on the class and *431 flawed use of statistics, amounts to a consideration of (1) whether the practice is discriminatory (aggregate impact) and (2) whether there is a valid basis for making the classification (flawed use of statistics). The court concluded that the gender-based classification was not discriminatory because if both the decedent and the beneficiary were female, the reversionary interest of the decedent would be less than 5% and therefore not includable in decedent’s estate. Thus, females are advantaged or disadvantaged depending on their position as decedent or beneficiary. The court stated:
[T]here has been no showing that the challenged practice disadvantages the class of all directly affected women as compared to the class of all directly affected men. In some situations the IRS practice places a directly affected woman in a worse position than a similarly situated man, but at other times the practice places a directly affected woman in a better position than a similarly situated man. Moreover, nothing indicates that the overall distribution of comparative advantages and disadvantages favors one sex over the other. [775 F.2d at 466]
The court concluded that “[t]his kind of patchwork distribution of relative advantages and disadvantages is not the common pattern found in gender discrimination suits, and by itself does not show unconstitutional discrimination.” Id. at 466.
In the present case, the State argues that there is a similar “patchwork distribution of relative advantages and disadvantages,” and hence no unconstitutional discrimination can be found. However, unlike the situation in Manufacturers Hanover, there is no identifiable advantaged group of females that would preclude a finding of discrimination.
The State maintains that the mortality tables are used merely to determine the division of value between the life estate and the remainder interests, and that since it is always the total value of decedent’s estate that is taxed, there is no discrimination against females. There is only a more accurate allocation of value between the life estate and the remainder. This allocation, the Director contends, does not result in a greater tax burden because when the value of the life estate of a female life tenant is increased, the value of the remainder interest will decrease.
*432 Director’s argument ignores the fact that the tax on the remainder is a compromise tax. The compromise tax customarily offered by the bureau where the beneficiary cannot be identified as of the date of death of the decedent is substantially less than a direct tax.[4] Therefore, taxpayer asserts, and it appears to the court, that in every case, the tax will be greater when the life tenant is a female and gender-based mortality tables are used, because a full direct tax is not imposed on the contingent remainder. This assertion by taxpayer has not been refuted by the State.
It is generally conceded that women, as a class, live longer than men. Los Angeles Dept. of Water & Power v. Manhart, 435 U.S. 702, 704, 98 S.Ct. 1370, 1373, 55 L.Ed.2d 657 (1978). This observation relates to women as a group, not as individuals. Segregated mortality tables treat males as a group and females as a group. Men and women die at all ages—some live longer, some shorter. It must be accepted for purposes of this case, by reason of the uncontroverted actuarial evidence, that in a group of males and females chosen at random, more than 80% of all female deaths can be matched with deaths of males of the same age.[5]
*433 The United States Supreme Court in Mississippi Univ. for Women v. Hogan, supra, 458 U.S. at 724, 102 S.Ct. at 3336, quoting Kirchberg v. Feenstra, 450 U.S. 455, 461, 101 S.Ct. 1195, 1199, 67 L.Ed.2d 428 (1981), and Personnel Administrator v. Feeney, 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870, 884 (1979), stated: “[T]he party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an ‘exceedingly persuasive justification’ for the classification.”
The subject gender-based tables are not more accurate because, at most, only 20% of women outlive men, and within this 20% there may be some men who outlive women, thus further reducing the 20% figure. When comparing the accuracy of gender-based tables with gender-neutral tables for the purpose of valuing life estates, I am obliged to conclude that the greater accuracy that is applicable to no more than 20% of the class does not justify the use of gender-based tables which are less accurate for 80% of the class. I conclude that the Director has not borne his burden of establishing that the use of gender-based mortality tables is justified as substantially related to the achievement of the objective of accuracy in the valuation of life estates.
Manufacturers Hanover involved the valuation of a decedent’s reversionary interest in an inter vivos trust, to determine whether it met the 5% test for inclusion in the gross estate *434 for federal estate tax purposes. The determination of this interest depended on the life expectancy of two lives, those of the decedent and the beneficiary.[6] Under the facts of that case, it did not matter whether the decedent was a male or a female aged 88 as long as the beneficiary was a male aged 57. In both instances, the value of the residuary exceeded 5%. However, if the beneficiary were a female aged 57, then the value of the residuary would be less than 5%.
The majority of the court of appeals could characterize the effect of the use of a gender-based table as a “kind of patchwork distribution of relative advantages and disadvantages” because of the differing tax results for the various male-female combinations of decedents and residuary beneficiaries. However, for New Jersey transfer inheritance tax purposes the sole measuring life is that of the life tenant. If the life tenant is a female, the value of her life estate, and therefore the tax, will exceed the value and tax for a male life tenant. It does not matter whether the remainder beneficiary is male or female.
The facts of the subject case indicate that men and women are not equally advantaged and disadvantaged, and therefore discrimination does exist. The accuracy of the statement in the actuary’s affidavit that only 19.4% of females live longer than males is not controverted. I conclude from the statistics that the use of gender-based mortality tables is not substantially related to the achievement of governmental objectives and that the only practical alternative in this case is to order the use of a gender-neutral table to value the life estate.[7]
I also note that prior to 1977 the State of New Jersey used gender-neutral mortality tables, and that in 1983 the Internal Revenue Service began using gender-neutral mortality tables. *435 The dissenting opinion in Manufacturers Hanover stated, with respect to the resumption by the Internal Revenue Service of use of a unisex mortality table:
I do not suggest that taxation is a field requiring the Government to use the least restrictive means in accomplishing its legitimate objectives. And what the Government elects to do is of course not the determinant of what the Constitution minimally requires it to do. Nevertheless, in the inquiry as to whether gender-distinct tables “substantially” promote an “important” governmental objective, the fact that the Government has come to realize that it can adequately meet its objectives without the use of the challenged discrimination is at least relevant. [ 775 F.2d at 475].
I conclude that the Director has not established the absence of discrimination against directly-affected females as a class compared to directly-affected males as a class, and has not established that statistics justify treating all females differently from males based on gender-based group averages. Therefore, he has not met the burden of establishing that the use of gender-based mortality tables is substantially related to the achievement of the governmental objective of accuracy in the valuation of life estates. Accordingly, I conclude from the evidence in this case that equal protection principles preclude the use of the separate male and female tables referred to in N.J.S.A. 54:36-2. The Director is directed to use the gender-neutral mortality table submitted as part of the record in administering N.J.S.A. 54:36-2 and valuing the subject life estate.
III.
Taxpayer also contests the compromise tax offered by the bureau on the contingent remainder interests. Taxpayer contends that the compromise offer should take into consideration the 1985 amendment of N.J.S.A. 54:34-2, which exempts from inheritance tax all transfers to a decedent’s issue made on or after July 1, 1988 (L.1985, c. 57).
N.J.S.A. 54:36-4 provides that when an instrument creates a power of appointment, the life estate, if taxable, shall be immediately appraised and taxed at its market value, but that the appraisal and taxation of the remainder interests shall be *436 suspended until the exercise of the power of appointment, and then taxed at the market value of such property determined as of the date of death of the creator of the power. Taxpayer argues that the appropriate time for valuing the interests and assessing any tax on a transfer to a contingent remainder interest, or a transfer pursuant to a power of appointment, is at the time the transfer to the beneficiary or beneficiaries is actually made, and that it should be at the tax rate in effect on the date of death of the life tenant.
Taxpayer contends that the bureau’s offer of compromise improperly bases its assessment of the potential tax on the subject contingent remainder interests on rates in effect at the date of decedent’s death. It urges that the rates in effect on the death of the life tenant should apply, and seeks an order to compel the Director to recompute the compromise tax by considering tax rates in effect on the date or dates of likely distribution of the remainder interest.
.The parties have stipulated that it has been the practice of the Transfer Inheritance Tax Bureau to apply tax rates and exemptions in effect at the date of a decedent’s death for the purpose of taxing transfers intended to take effect at death, and for later transfers, and that it has been the bureau’s practice to enter into compromise agreements with estates based on tax rates in effect at the time of decedent’s death, even though the transfers may not take effect until after the effective date of a change in the inheritance tax law.
N.J.A.C. 18:26-2.2 provides:
The right of the State to the inheritance tax on transfers vests at the moment of a decedent’s death so that the law prevailing at the time of death of a resident or nonresident controls the transfers subject to the tax and the rates thereon.
In accordance with the regulation, the date-of-death tax rates are applicable. It is well established that there is a presumption of reasonableness of administrative regulations. New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561, 384 A.2d 795 (1978). The burden is on the attacking party to demonstrate that the regulation is arbitrary, capricious or un *437 reasonable. Ibid. See Futurevision Cable Enterprises v. Taxation Div. Director, 6 N.J.Tax 149, 164 (Tax Ct.1983); Jenkins v. Taxation Div. Director, 184 N.J.Super. 402, 410 N.J.Tax 127, 134, 446 A.2d 217 (Tax Ct.1982).
Taxpayer’s argument with respect to the wording of N.J.S.A. 54:34-2 and 54:36-1 through -4, is not persuasive.
I find no basis in the statutes, and no reported decisions have been cited, to support taxpayer’s contention, and therefore find in favor of the Director on this issue. Taxpayer’s motion for summary judgment is granted on the issue of gender discrimination and denied on the issue of calculation of the compromise tax. Director’s motion for summary judgment is granted on the issue of calculation of the compromise tax and denied on the issue of gender discrimination.
The Clerk of the Tax Court is directed to enter judgment ordering the Director to reassess the direct tax on the subject life estate, using the gender-neutral mortality table submitted as part of the record in this case, and to recalculate the compromise tax to reflect this change in the direct tax, using the tax rate in effect on the date of decedent’s death.

Direct tax is to be distinguished from the compromise tax offered by the bureau in cases where the residuary beneficiaries are contingent and cannot be identified as of the date of death. N.J.S.A. 54:36-6; N.J.A.C. 18:26-2.14.

The Due Process Clause of the Fifth Amendment is applicable to the federal government, whereas the Equal Protection Clause of the Fourteenth Amendment applies to the states. Although the Fifth Amendment contains no Equal Protection language, it is well-settled that the Fifth Amendment encompasses equal protection principles. See Mathews v. DeCastro, 429 U.S. 181, 182, n. 1, 97 S.Ct. 431, 432, n. 1, 50 L.Ed.2d 389 (1976). The Supreme Court’s approach to equal protection claims under the Fifth and Fourteenth Amendments has always been the same. See Weinberger v. Wiesenfeld, 420 U.S. 636, 638, n. 2, 95 S.Ct. 1225, 1228, n. 2, 43 L.Ed.2d 514 (1975). Whether the Fifth Amendment Due Process Clause is invoked against the federal government, as in Manufacturers Hanover, or the Fourteenth Amendment Equal Protection Clause is invoked against a state government, as in the present case, the guarantees of equal protection are the same.

Challenges also have been made to gender-based mortality tables where employers use gender-based tables for pension calculations. Female employees have challenged the requirement that they make larger contributions to a pension fund than their male counterparts, City of Los Angeles v. Manhart, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), and have also claimed that they receive lower monthly retirement benefits than men who had made the same contributions, Arizona Governing Committee v. Norris, 463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983). These cases have invalidated the use of gender-based mortality tables, but are not controlling because they involve equal pay challenges under Title VII of the 1964 Civil Rights Act. In equal pay challenges under Title VII, the test is the same for sex discrimination and race discrimination because the statutory language of Title VII forbidding discrimination based on either race or sex is the same. 463 U.S. at 1084, 103 S.Ct. at 3499.
As a result of the Arizona Governing Committee v. Norris decision, the New Jersey Commissioner of Insurance adopted regulations requiring the use of gender-neutral mortality tables for employee benefits or defined contribution pension plans if the plan benefits differ due to the gender of the employee when insured by insurance companies. N.J.A.C. 11:4-22.2, as amended November 5, 1984.

At oral argument, counsel for taxpayer stated that he calculated the direct and compromise tax on the subject estate using the same method the Director used, but as if the life tenant had been a male instead of a female, and he found that the total of the direct and compromise tax on the estate would have been substantially less if the life tenant had been a male.
As a practical matter, the compromise tax route is chosen in cases involving contingent remainder interests. In most cases, the substantial tax discount of the compromise tax and the expense of posting a bond and awaiting the death of the life tenant make delay in payment of tax an undesirable alternative.

Others have also commented on the 80% overlap. "Both men and women die at all ages, over a range of more than one hundred years ... More than eighty percent of all female deaths can be matched with a contemporaneous male death. Thus, knowing a person's sex tells very little about when he will die____” Brilmayer, Hekeler, Laycock, Sullivan, "Sex Discrimination in Employer-Sponsored Insurance Plans: A Legal and Demographic Analysis,” 47 U.Chi.L.Rev. 505, 530-531 (1980). See also Bergman & Gray, "Equality and Retirement Benefits," Civ.Rights Dig. (Fall 1975) at 25.
*433 The dissenting opinion in Manufacturers Hanover stated: “Gender-distinct tables uniformly estimate a longer life expectancy for all women compared to all men when in fact the estimate turns out to be true for no more than 20% of women." 775 F.2d at 475; footnote omitted.
Even those who argue that the 80% overlap lacks statistical significance when applied to benefits priced prospectively, such as a pension, do not refute its existence. See Kimball, “Reverse Discrimination: Manhart,” 1979 Am.B.Found.Res.J. 85, 121-122. Kimball reasons that a prospective benefit must be priced when it is purchased. At that time, the cost to provide the benefit is unknown. Because the cost of the pension can only be based on accurately ascertained probabilities, the use of averages or means, such as gender-based tables, is appropriate. This reasoning is contrary to the holding in Manhart, supra.

In Manufacturers Hanover, the decedent was a female aged 88 and the beneficiary was a male aged 57.

No evidence has been presented as to the accuracy of a gender-neutral table or as to the relative accuracy of gender-neutral and gender-based tables, but because a gender-neutral table does not differentiate by gender, it treats all individuals alike and resolves taxpayer's equal protection challenge.