2000 SD 32

**ESTATE OF Rose Evelyn KARNEN, a.k.a. Rose Karnen, deceased.**

**No. 20910.**

Supreme Court of South Dakota.

Considered on Briefs Jan. 10, 2000.

Decided March 1, 2000.

Wesley W. Buckmaster of Buckmaster and Macy, Belle Fourche, for appellee Estate.

Dale R. Hansen of Hansen, Hubbard & Swanson, Sturgis, for appellant Andrew J. Karnen.

MILLER, Chief Justice.

[¶ 1.] This case presents our first opportunity to interpret certain provisions of our Unified Probate Code (UPC) elective share provisions effective as of July 1, 1995. Andrew Karnen appeals the denial of his petition for elective share from his wife's estate, disputing the determination and value of assets used to satisfy his elective share entitlement. We affirm.

## FACTS

[¶ 2.] The essential facts in this case are not in dispute. Rose Karnen and Andrew Karnen married in July 1947, when Rose was approximately forty years old. There were no children born to this marriage. She owned a ranch at the time of her marriage to Andrew. When Rose died on August 8, 1997, she and Andrew had been married for over fifty years. Her estate was valued at over two million dollars, and virtually all assets were titled in her name only.

[¶ 3.] Due to her failing health, in January 1996 Norwest Bank, SD, N.A., (Norwest) was appointed the conservator of Rose's estate. Prior to Norwest's appointment, Rose had a simple will, which bequeathed all her property to Andrew. After Norwest became conservator, Rose's new will was drafted. It was designed to take advantage of her federal estate tax exemption while still making her assets available to Andrew until his death. The new will also created two testamentary trusts: a unified credit trust (Family trust)

and a Q–TIP trust. Upon Rose's death, all of her assets were placed into one or the other of these trusts.

[¶ 4.] The Family trust was funded up to the amount of Rose's federal estate tax credit, approximately $640,000. The remainder of her assets, approximately $1,370,000, were placed in the Q–TIP trust. Andrew was named the sole income and principal beneficiary of both trusts. After Andrew's death, the corpus of both trusts was to be distributed to the remaindermen, Rose's heirs. Her will provided that the income and principal of the Q–TIP trust was to be used prior to accessing any income or principal from the Family trust. Article VI(A) of Rose's will directed that the Family trust be administered as follows:

If my spouse survives me, then commencing as of the date of my death and during the life of my spouse, the trustee shall distribute to my spouse from time to time living [sic] as much of the net income and principal of the Family Trust, even to the extent of exhausting principal, as the trustee from time to time believes desirable (i) for the health, support in reasonable comfort, education, best interests, and welfare of my spouse considering all of the circumstances and factors deemed pertinent by the trustee provided, however, that:

1. Any undistributed net income shall be accumulated and added to the principal of the Family Trust, as from time to time determined by the trustee;

2. My primary concern during the life of my spouse is for the health and support in reasonable comfort of my spouse, and the trustee need not consider the interest of the ultimate beneficiaries in making distributions to my spouse under this paragraph;

3. Insofar as the trustee deems it advisable, no principal of the Family Trust shall be distributed to my spouse as long as any principal re-

mains in the trust named for my spouse [the Q–TIP trust].

[¶ 5.] Further, Article VII(B) of Rose's will provided:

Among the circumstances and factors to be considered by the trustee in determining whether to make discretionary distributions of net income or principal to a beneficiary are the other income and assets known to the trustee to be available to that beneficiary and the advisability of supplementing such income or assets.

[¶ 6.] After Rose died, Andrew filed a petition for elective share to take against the will rather than under its provisions. The circuit court certified that the petition had been timely filed and, based upon the length of the marriage, Andrew's elective share was 50% of the augmented estate. A hearing was held on July 16, 1998, to determine the amount of the elective share to which Andrew was entitled. After reviewing the evidence and hearing testimony, the trial court determined that Andrew's petition for elective share was overfunded, because the amount made available to him via the will was more than he would receive under the elective share. The court therefore denied the petition for elective share. Andrew subsequently filed a motion for reconsideration, which was also denied. He now appeals,[1] generally raising the following issues:

1. Whether the Family trust has any ascertainable value for purposes of satisfying Andrew's elective share entitlement.

2. If the Family trust does have an ascertainable value, what are the correct annuity valuation and mortality tables to be used for determining its present value.

3. Should the value of the remainder interest in the homestead be included in the value of the Q–TIP trust, for

---

1. In June 1998 Pioneer Bank and Trust was appointed conservator for Andrew.

purposes of satisfying Andrew's elective share entitlement.

## STANDARD OF REVIEW

[¶ 7.] In interpreting another provision of the South Dakota Uniform Probate Code, we stated:

This Court interprets statutes under a de novo standard of review without deference to the decision of the trial court. *City of Brookings v. Winker,* 1996 SD 129, ¶ 4, 554 N.W.2d 827, 828; *In re Estate of Steed,* 521 N.W.2d 675, 680 (S.D.1994).

[¶ 8.] In addition, this Court has previously noted:

"Statutes are to be construed to give effect to each statute and so as to have them exist in harmony. *State v. Woods,* 361 N.W.2d 620, 622 (S.D.1985); *Matter of Exploration Permit Renewal,* 323 N.W.2d 858, 860 (S.D.1982). It is a fundamental rule of statutory construction that the intention of the law is to be primarily ascertained from the language expressed in the statute. *Petition of Famous Brands, Inc.,* 347 N.W.2d 882, 884 (S.D.1984). In addition, we are statutorily mandated to interpret uniform laws such as the [UPC] 'to effectuate its general purpose to make uniform the law of those states which enact it.' SDCL 2–14–13."

*Matter of Estate of Jetter,* 1997 SD 125, ¶¶ 10–11, 570 N.W.2d 26, 28 (quoting *Rushmore State Bank v. Kurylas, Inc.,* 424 N.W.2d 649, 653 (S.D.1988)).

[¶ 9.] We have stated in prior elective share proceedings:

Recent decisions of this court have made it clear that the equitable determination in an elective share proceeding is within the discretion of the trial court and will not be overturned absent an abuse of that discretion. *Matter of Estate of Pejsa,* 459 N.W.2d 243 (S.D.1990); *Matter of Estate of Clyde,* 423 N.W.2d 513 (S.D. 1988); *In Re Estate of Smith,* 401 N.W.2d 736 (S.D.1987); *see also* 1 S.

Childress & M. Davis, *Standards of Review,* § 4.21, p. 287 *et seq.* An abuse of discretion will be measured by an objective reasonableness standard. As stated in *Davis v. Kressly,* 78 S.D. 637, 107 N.W.2d 5, 8 (S.D.1961):

We are not to determine whether the judges of this court would have made an original like ruling, but rather whether we think a judicial mind, in view of the law and the circumstances of the particular case, could reasonably have reached such a conclusion.

Stated another way, a trial court's findings of fact and the subsequent application of discretion shall not be disturbed unless there is clearly no basis in reason or evidence to support that finding. *Pejsa,* 459 N.W.2d at 245.

*Matter of Estate of Donahue,* 464 N.W.2d 393, 394–95 (S.D.1990).

## DECISION

[¶ 10.] **1. Whether the Family trust has any ascertainable value for purposes of satisfying Andrew's elective share entitlement.**

[¶ 11.] In finding that Andrew's elective share was overfunded, the trial court determined, pursuant to SDCL ch 29A–2, that the value of the augmented estate was $2,602,189. Andrew's elective share was 50% of that amount, or $1,301,-095. Sources used to fund the elective share included the commuted value of a life interest in the Family trust ($233,474), the commuted value of a life interest in the Q–TIP trust ($504,193), Andrew's assets ($381,080), one-half of jointly owned property ($205,150), and personal property willed to him ($48,559). Applying these sources to the elective share amount, the court determined that the elective share was overfunded by $71,361, and the petition was denied.

[¶ 12.] As his first issue in this appeal, Andrew claims that his life interest in the Family trust has no ascertainable value and should therefore be excluded as a

source used to fund his elective share under SDCL 29A–2–209. He makes this claim because distribution to him from the Family trust is discretionary rather than mandatory and, because in light of his other sources of income,[2] it is "simply inconceivable that [he] should need any income, or should be paid any income, from the Family trust." The effect of Andrew's proposed exclusion is that his elective share would be underfunded by $162,113, and this shortfall would have to be funded from other assets in Rose's estate.

[¶ 13.] The underlying purpose of Andrew choosing to take against the will, rather than under it, is apparently to attain a fee interest in a portion of the estate assets, rather than merely the life interest granted in the will. By taking title to assets in fee, Andrew thus will be able to pass something on to his heirs. His appellate brief states:

> The remaindermen of both the Family Trust and the Q–TIP trust are the heirs of [Rose Karnen]. Andrew and [Rose] had no children. Therefore, upon Andrew's death, whatever balance of principal in the Q–TIP trust, and principal and accumulated income in the Family Trust remain, will be distributed to the heirs of [Rose], and Andrew's heirs will receive nothing from either of these two

Trusts upon the death of Andrew. This is an unjust result, given the fact that [Rose] and Andrew were married in excess of 50 years.

[¶ 14.] While we understand how Andrew might feel that he is entitled to fee ownership in a share of the estate after fifty years of marriage, our elective share statutes do not accommodate such a position. The goal of our elective share statutes is to protect a surviving spouse from disinheritance, rather than reward him or her for contributions made to the economic partnership of an enduring marriage.

[¶ 15.] SDCL 29A–2–209 identifies the sources from which the elective share is to be paid. It provides in pertinent part:

a) In a proceeding for an elective share, the following are applied first to satisfy the elective-share amount and to reduce or eliminate any contributions due from the decedent's probate estate and recipients of the decedent's nonprobate transfers to others:

(1) Amounts included in the augmented estate under § 29A–2–204[3] which pass or have passed to the surviving spouse by testate or intestate succession and amounts included in the augmented estate under § 29A–2–206;[4]

---

**2.** Andrew owns separate assets valued at approximately $615,000, which produce an annual income of $34,000. From August 8, 1997 (date of Rose's death) to July 31, 1998, the assets of the estate earned $68,752 of income. This amount was allocated between the two trusts, with the Family trust receiving 32% ($21,962) and the Q–TIP trust receiving 68% ($46,790). The latter amount was distributed to Andrew under the terms of the will, but the former amount was retained in the Family trust.

**3.** SDCL 29A–2–204 states: The value of the augmented estate includes the value of the decedent's probate estate, reduced by funeral and administration expenses, homestead allowance, family allowances, exempt property, and enforceable claims.

**4.** SDCL 29A–2–206, "Decedent's non-probate transfers to surviving spouse," provides:

Excluding property passing to the surviving spouse under the federal Social Security system, the value of the augmented estate includes the value of the decedent's nonprobate transfers to the decedent's surviving spouse, which consist of all property that passed outside probate at the decedent's death from the decedent to the surviving spouse by reason of the decedent's death, including:

(1) The decedent's fractional interest in property held as a joint tenant with the right of survivorship, to the extent that the decedent's fractional interest passed to the surviving spouse as surviving joint tenant;

(2) The decedent's ownership interest in property or accounts held in co-ownership registration with the right of survivorship, to the extent the decedent's ownership interest passed to the surviving spouse as surviving co-owner; and

(2) Amounts included in the augmented estate which would have passed to the spouse but were disclaimed;[5] and

(3) Amounts included in the augmented estate under § 29A–2–207[6] up to the applicable percentage thereof. For the purposes of this subsection, the "applicable percentage" is twice the elective-share percentage set forth in the schedule in § 29A–2–202(a) appropriate to the length of time the spouse and the decedent were married to each other.

[¶ 16.] Further, SDCL 29A–2–208(b)(2) describes the valuation of property:

(3) All other property that would have been included in the augmented estate under section 29A–2–205(1) or (2) had it passed to or for the benefit of a person other than the decedent's spouse, surviving spouse, the decedent, or the decedent's creditors, or estate creditors.

5. This "disclaimer provision" was deleted in a 1993 amendment to the UPC. The comment to the revised § 2–209 discusses the complications that can arise from disclaimer provisions such as SDCL 29A–2–209(a)(2). It states:

The provision that the spouse is charged with amounts that would have passed to the spouse but were disclaimed was deleted in 1993. That provision was introduced into the Code in 1975, prior to the addition of the QTIP provisions in the marital deduction of the federal estate tax. At that time, most devises to the surviving spouse were outright devises and did not require actuarial computation. Now, many if not most devises to the surviving spouse are in the form of an income interest that qualifies for the marital deduction under the QTIP provisions, and these devises require actuarial computations that should be avoided whenever possible.

Unif. Probate Code § 2–209 cmt. (amended 1993), 8 ULA 124 (1998).

6. SDCL 29A–2–207, "Surviving spouse's property and nonprobate transfers to others," states:

(a) Except to the extent included in the augmented estate under section 29A–2–204 or 29A–2–206, the value of the augmented estate includes the value of:

The value of property includes the commuted value of any present or future interest and the commuted value of amounts payable under any trust, life insurance settlement option, annuity contract, public or private pension, disability compensation, death benefit or retirement plan, or any similar arrangement, exclusive of the federal Social Security system.

[¶ 17.] Notwithstanding Andrew's arguments, SDCL ch. 29A–2 clearly contemplates that a life interest is to be valued at its present value and applied to satisfy the elective share amount, regardless of whether the benefit is discretionary or mandatory or whether the surviving spouse chooses to accept such interest.

(1) Property that was owned by the decedent's surviving spouse at the decedent's death, including:
(i) The surviving spouse's fractional interest in property held in joint tenancy with the right of survivorship;
(ii) The surviving spouse's ownership interest in property or accounts held in co-ownership registration with the right of survivorship; and
(iii) Property that passed to the surviving spouse by reason of the decedent's death, but not including the spouse's right to homestead allowance, family allowance, exempt property, or payments under the federal Social Security system; and
(2) Property that would have been included in the surviving spouse's nonprobate transfers to others, other than the spouse's fractional and ownership interests included under subsection (a)(1)(i) or (ii), had the spouse been the decedent.
(b) Property included under this section is valued at the decedent's death, taking the fact that the decedent predeceased the spouse into account, but, for purposes of subsection (a)(1)(i) and (ii), the values of the spouse's fractional and ownership interests are determined immediately before the decedent's death if the decedent was then a joint tenant or a co-owner of the property or accounts. For purposes of subsection (a)(2), proceeds of insurance that would have been included in the spouse's nonprobate transfers to others under section 29A–2–205(1)(iv) are not valued as if the surviving spouse were deceased.
(c) The value of property included under this section is reduced by enforceable claims against the surviving spouse.

SDCL 29A–2–209(a)(2) states that even if a surviving spouse disclaims his or her interest under the will, that amount is to be used to satisfy the amount of the elective share. Further, under SDCL 29A–2–208(b)(2), the value of a life interest is equal to its commuted value. The Family trust was a testamentary trust created upon Rose's death, and Andrew's property interest in that trust passed to him at that time. Andrew is the sole lifetime discretionary income and principal beneficiary of the Family trust. As such, he has a present interest in the Family trust. Thus, the commuted value of the life interest conferred to Andrew upon Rose's death must be included pursuant to SDCL 29A–2–208 and 209. The only question remaining is how to arrive at the commuted value of a life interest.

**[¶ 18.] 2. If the Family trust does have an ascertainable value, what are the correct annuity valuation and mortality tables to be used for determining its present value.**

■ [¶ 19.] The trial court rejected Andrew's proposed "case-by-case approach" to valuation of life interests, finding that such valuations are inherently speculative. The court instead adopted the Estate's use of the South Dakota Inheritance Tax 7.5% Annuity Table [Inheritance Tax Table] in valuing Andrew's life interests in the Q–TIP trust, the Family trust and the homestead. The Inheritance Tax Table utilizes a unisex mortality computation rate. In addition, the actual age of the surviving spouse as of the date of the decedent's death is used to determine life expectancy. The trial court stated:

The South Dakota Inheritance Tax 7.5% Annuity Table provides a technique for the valuation of the life interests of the Petitioner which is fair, practical, workable and which affects broadly equitable as well as predictable results. The use of the South Dakota Inheritance Tax 7.5% Annuity Table in valuing life interests for elective share purposes provides consistency with the process of valuing

life interests in trust for South Dakota inheritance tax purposes.

[¶ 20.] The court supported its decision by pointing out that the Inheritance Tax Table was nearly identical to two other broadly accepted methods of valuing life interests.

[¶ 21.] Andrew contends that a 7.5% rate is unrealistic and has no relationship to the actual return he can expect to receive during the remainder of his life. He further argues that the purpose of the elective share statutes ("to provide relief and equalization between spouses") is unrelated to the purpose of the Inheritance Tax Table (to collect inheritance tax), therefore it cannot be used to compute the value of the life interest for elective share purposes. Andrew urges this Court to calculate the present value, using realistic methodology and interest rates, so that the income he receives for the remainder of his life will be as close as possible to the cash value of assets he would have received had neither trust been established. He specifically requests that we determine the correct valuation table to be used is a 6% annuity table. We decline.

[¶ 22.] In adopting our Uniform Probate Code, the legislature provided no method of valuation for life interests. However, for estate taxation purposes, the legislature has specifically directed that property transferred into trust with discretion to pay the income from the trust to the decedent's spouse is considered and taxed as a life estate. SDCL 10–40–16.1. For taxation purposes, the method of valuing life estates is that employed by the division of insurance in ascertaining the value of life insurance policies and annuities, and the interest rate is set at 7.5%. SDCL 10–40–14. In *Matter of Estate of Donahue*, 464 N.W.2d 393, 395–96 (S.D.1990), decided prior to the enactment of the UPC in South Dakota, we upheld the use of a standard mortality table in computing the present value of property for elective

share purposes.[7] There the appellant failed to object to the use of said mortality table. *Id.*

[¶ 23.] As Andrew acknowledges in the record, "[b]ecause the UPC is silent as to how to value partial interests, such as trusts, the commonly accepted method is to use the Present Value Mortality Tables, as adopted by the Internal Revenue Service for federal estate taxes and other tax treatments." Andrew agrees that as of Rose's date of death, the federal estate tax commuted value rate was 7.6%.

[¶ 24.] Without specific statutory guidance to the contrary, we see no abuse of discretion in the trial court's adoption of the Inheritance Tax Table. As the court stated, the use of a standard mortality and interest table provides stability and predictability to the field of estate planning. In this way, the method for determining the present value of trusts in South Dakota will be consistent, whether the valuation is for taxation purposes or elective share purposes. Individuals will be able to create their estate plans certain of the method that will be used to compute the present value of any life estates they bestow. While the use of the Inheritance Tax Table may be disadvantageous to Andrew, it will generally deliver a predictable, reliable standard upon which individuals can value life interests. Our decision is supported by the fact that two other widely used present value indicators, the federal estate tax commuted value rate (7.6%) and the ten-year average for long term U.S. bonds (7.58%), were within .1% of the Inheritance Tax Table rate. We see no abuse of discretion by the trial court in using such table.

[¶ 25.] Nor do we see any abuse in the fact that the Inheritance Tax Table is a unisex mortality table, as opposed to a gender-specific table. Andrew argues that because males have a shorter life expectancy than females, the Inheritance Tax Table used by the trial court does not accurately reflect his true life expectancy. However, Andrew provides no authority for his position,[8] and we can see no reason why the average life span among both males and females should not be used. The U.S. Treasury Department uses a unisex table for computing the present value of life interests for estate tax purposes.[9] Further, the alternative would require maintaining and using separate mortality tables, depending on whether the beneficiary is a male or a female. This method of determining the present value of a life interest would be cumbersome and inefficient. In fact, although Andrew argues that the court's use of the unisex Inheritance Tax Table was an abuse of discre-

7. In *Donahue,* the table in question was the Commissioner's Standard Ordinary Basic Table of Mortality. This is one of the tables used by the division of insurance in ascertaining the value of life insurance policies and annuities. *See generally* SDCL 58–26–45 and 57 through 60.

8. As we have frequently stated, failure to cite an authority constitutes a waiver of the issue. *State v. Pellegrino,* 1998 SD 39, ¶ 22, 577 N.W.2d 590, 599; *Gleason v. Peters,* 1997 SD 102, ¶ 20, 568 N.W.2d 482, 486; *Mid–Western Elec., Inc. v. DeWild Grant Reckert & Assoc. Co.,* 500 N.W.2d 250, 255 (S.D.1993). However, this case presents issues of first impression under our recently enacted UPC, therefore very little relevant case law exists.

9. To be sure, unisex tables have not been without controversy. Prior to 1971, the U.S. Treasury Department's regulations were based on unisex mortality assumptions. The regulations were changed, and from 1970 to 1983, the regulations relied upon gender-specific mortality assumptions. However, in response to a suit challenging the constitutionality of using gender-specific mortality rates, the Treasury Department reverted to the use of unisex tables. The U.S. Court of Appeals for the Second Circuit ultimately upheld the use of gender-specific mortality tables against the constitutional challenge, *Manufacturers Hanover Trust Co. v. United States,* 775 F.2d 459 (2dCir.1985), *cert. denied,* 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986), but the Treasury Department nonetheless continues to use unisex mortality assumptions in its regulations. *See generally,* Jeffrey G. Sherman, *'Tis a Gift to be Simple: The Need for a New Definition of 'Future Interest' for Gift Tax Purposes,* 55 UCinLRev 585 (1987).

tion, he did not offer a gender-specific table for the court to use as an alternative. Instead, his CPA computed a male life estate present value rate by performing a dubious extrapolation calculation involving male-to-female mortality rates as applied to the IRS unisex table. Such a calculation was admittedly not in compliance with generally accepted accounting principles. Because there appears to be a clear basis in reason and evidence for the trial court's use of the Inheritance Tax Table in valuing Andrew's life interest, we see no abuse of discretion.

■ [¶ 26.] Finally, we see no abuse of discretion in using the *actual* age of the beneficiary as of the date of decedent's death, as opposed to using the *nearest* age of the beneficiary as of the date of decedent's death. Andrew argues that the court should have used the age to which he was closest, rather than his actual age, on the date of Rose's death, to determine his life expectancy. He says this method more accurately reflects his true life expectancy. Andrew was 81 when Rose died on August 8, 1997, but his 82nd birthday was only three months away, in November 1997. Therefore, he was closer to 82 than 81. According to Andrew, we should adopt the federal government's method, which uses the age to which the beneficiary is closest, rather than the beneficiary's actual age. We disagree.

[¶ 27.] That the federal government uses the age closest to the date of death is of no import under our statutes. Again, our goal is to create a uniform and predictable method of determining the present value of a life interest. Adopting the method used by other South Dakota entities, instead of the method used by the federal government, accomplishes that goal. Therefore, we affirm the trial court's use of the Inheritance Tax Table in computing the present value of Andrew's life interest in Family trust, the Q–TIP trust and the homestead, because we see no abuse of discretion.

[¶ 28.] Should the legislature disagree with our foregoing interpretation it surely has the right, and the responsibility, to give specific guidance.

[¶ 29.] **3. Should the value of the remainder interest in the homestead be included in the Q–TIP trust, for purposes of satisfying Andrew's elective share entitlement.**

■ [¶ 30.] The trial court did not include the value of the remainder interest in the homestead when it calculated the net probate value or the value of the Q–TIP trust. However, Andrew argues that the full value of the homestead allowance, including both the life interest and the remainder value, should be deducted from the Q–TIP trust because it is not income producing property. The Q–TIP trust, Andrew asserts, is intended to generate income for him and, since the homestead allowance does not produce any income, it should not be included in the Q–TIP trust. We disagree.

[¶ 31.] Andrew purposely chooses not to consistently use the same homestead value in his elective share calculation. Particularly, when it is advantageous for him to use a very low homestead allowance, he includes only the life interest value of approximately $30,000. This has the effect of creating a high net probate value, 50% of which is the elective share entitlement. Conversely, when it is advantageous for Andrew to use a very high homestead allowance, he includes the combined life estate and remainder values of the homestead, for a total value of $115,000. This amount is deducted from the value of the Q–TIP trust, which is considered a funding source for the elective share. As a result, that funding source is smaller, and the elective share deficit is larger, thereby entitling Andrew to additional assets in order to fund the elective share. Andrew cannot have his cake and eat it too.

[¶ 32.] Both parties agree that the value of Andrew's homestead allowance is a life interest. *See generally, In re Swanson's Estate*, 79 S.D. 3, 107 N.W.2d 256, 259–60

(S.D.1961); *In re Clouse's Estate,* 63 S.D. 147, 257 N.W. 106, 108 (S.D.1934) (discussing the distinction between a life interest versus a remainder interest in a homestead). The homestead allowance must be used consistently throughout the calculation of the elective share. Our statutes do not tolerate a manipulation of figures in order to produce the most desirable result for the surviving spouse. Only through the use of one, accurate, consistently applied figure can a fair valuation of the elective share be ascertained. The life interest value is the correct (and only) amount to be used as the homestead allowance throughout the elective share calculation, and we do not think the trial court abused its discretion in so holding.[10]

[¶ 33.] The trial court's decision is affirmed in all respects.

[¶ 34.] AMUNDSON, KONENKAMP, and GILBERTSON, Justices, concur.

[¶ 35.] SABERS, Justice, concurs in part and dissents in part.

SABERS, Justice (concurring in part and dissenting in part).

[¶ 36.] **It was an abuse of discretion to use a unisex mortality table in determining the present value of Andrew's life estate.**

[¶ 37.] I dissent to the majority opinion's determination that the use of a unisex mortality table, as opposed to a gender-specific table, is not an abuse of discretion.

[¶ 38.] When dealing with life estates, a present value must be determined. The valuation date is the date of the decedent's death. SDCL 29A–2–207(b). SDCL 10–40–14 provides how to value the estate:

> The value of every future or limited estate, ... dependent upon any life or lives in being, shall be determined by rule, method, and *standard of mortality* and value employed by the director of the division of insurance in ascertaining the value of policies of life insurance and annuities for the determination of liabilities of life insurance companies....

(emphasis added). In determining the liabilities of life insurance companies, the director "shall annually value the reserve liabilities for all outstanding life insurance policies ... of every life insurance company doing business in this state, and may certify the amount of any of the reserves, specifying the mortality table or tables...." SDCL 58–26–45.

[¶ 39.] The mortality tables that can be used are specified under SDCL 58–26–57.[11] The division of insurance and life insurance companies are allowed to use one of three different mortality tables to determine the value of life insurance policies issued after July 1, 1982.[12] The first table is the Commissioners 1980 Standard Ordinary Mortality Table. This table is unquestionably gender-specific. It is based on male lives, with a six-year variation for females. *See Telles v. Commissioner of*

---

10. By definition, a Q–TIP trust is only a life estate interest to Andrew. Q–TIP is an acronym for "Qualified Terminal Interest Property." It is "a type of marital deduction bequest in which the surviving spouse receives all of the income for life but is not given a general power of appointment." Black's Law Dictionary 864 (Abr6thEd. 1991). Given its definition and purpose, it seems illogical that the remainder interest would be included in the valuation of a Q–TIP trust for purposes of satisfying a surviving spouse's elective share.

11. This statute is derived, essentially verbatim, from the National Association of Insurance Commissioners (NAIC), Model Regulation 820–1.

12. "Since we construe statutes according to their intent, the intent must be determined from the statute as a whole, as well as other statutes relating to the same subject." *Maynard v. Heeren,* 1997 SD 60, ¶ 13, 563 N.W.2d 830, 835 (citing *U.S. West Communications, Inc. v. Public Utils. Comm'n,* 505 N.W.2d 115, 123 (S.D.1993)). SDCL 58–26–45 and 58–26–57 both relate to the valuation of life insurance policies. The plain language of both statutes is clear, certain and unequivocal, and those statutes, when read together, show that only specific mortality tables are acceptable, whether used by the life insurance companies or the division of insurance.

*Ins.*, 410 Mass. 560, 574 N.E.2d 359, 362 (1991) (stating that this table "treated males and females as distinct classes, with separate mortality tables."); McGill's Life Insurance 315–17 (Edward E. Graves ed., American College 1994).

[¶ 40.] The second table listed in SDCL 58–26–57, the Commissioners 1980 Standard Ordinary Mortality Table with 10–year select mortality factors, expanded the first table to allow an insurer to consider factors that affect a person's risk of death. *See* National Association of Insurance Commissioners, *Valuation of Life Insurance Policies* (visited February 9, 2000)(setting forth select factors that distinguish between female smokers, male smokers, female non-smokers and male non-smokers). Therefore, it is also a gender-specific table. McGill's, *supra*, at 314, 318–19.

[¶ 41.] The third possibility is a broad categorization of "any ordinary mortality table, adopted after 1980 by the [NAIC]. . . ."

[¶ 42.] Unisex, or sex-neutral, mortality tables are based on the average life expectancies of both male and female. The different life expectancies are not calculated or even recognized. Instead, the mortality rates for men and women are combined at a ratio of $^5\!/\!_{00}$ and then averaged. Therefore, the gender-specific table is significantly more accurate than simple comprehensive unisex tables. *See In re Darrin*, 11 N.J.Tax 482, 495 (1991) (stating "the degree of accuracy associated with the use of gender-based tables for males as a class and females as a class is greater than that associated with the use of the gender-neutral table. . . .").

[¶ 43.] The Supreme Court of Massachusetts noted the problem associated with the adoption of unisex tables in the issuance of individual life insurance policies:

The mortality rates for males are generally higher than those for females. In the case of ordinary life insurance, which involves periodic premium payments un-til the policy matures, a woman would likely make payments for a longer period of time before death. Therefore, prior to these regulations, life insurance premiums were lower for females than they were for males. Pursuant to the unisex regulations, insurance companies must ignore gender in the determination of insurance rates, benefits, conditions, or requirements. The regulations, therefore, have resulted in higher life insurance premiums for women than for men.

*Telles*, 574 N.E.2d at 360–61.

[¶ 44.] More specifically, one study revealed that if unisex tables replaced the gender-specific tables, the aggregate female class would pay $1060 million more for life and automobile insurance per year than the male class. George J. Benston, *Discrimination and Economic Efficiency in Employee Fringe Benefits: A Clarification of Issues and a Response to Professors Brilmayer, Laycock and Sullivan*, 50 UChiLRev 250, 275–77 (1983) (citing *Hearings on S. 2204 Before the Senate Comm. On Commerce, Science and Transportation*, 97th Cong., 2d Sess. 8–9 (1982) (statement of the American Academy of Actuaries, Committee on Risk Classification)). Obviously, the use of the unisex tables results in disparate treatment between the genders and is not the correct table to use in valuing individual life insurance policies.

[¶ 45.] Our statutes base the valuation of a life estate on the methods of valuation of life insurance policies. A life tenant, especially a male life tenant, should not be prejudiced by a value computed pursuant to unisex tables. Under a unisex table, the male life tenant receives less than what he is entitled to because males do not live as long as females. Although precise accuracy can not be determined when valuing a life estate at the time of transfer, it is clear that the gender-specific mortality table produces a much more accurate valuation than a unisex table.

[¶ 46.] In failing to use a gender-specific table, the trial court abused its discretion.

An abuse of discretion has been determined to exist "when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system." *Pellegrin v. Pellegrin*, 1998 SD 19, ¶ 31, 574 N.W.2d 644, 650 (Konenkamp, J., concurring in part and dissenting in part) (quoting *Tyler v. Tyler*, 253 Neb. 209, 570 N.W.2d 317, 319 (1997)). The trial court's decision to use a unisex table instead of a gender-specific table in determining the present value of Andrew's life estate prejudiced him. Thus, it was an abuse of discretion.

[¶ 47.] I vote to reverse the trial court's use of the unisex table and remand for a correct valuation under a gender-specific table.