2001 SD 18

In the Matter of the ESTATE OF
Howard AMUNDSON.

In the Matter of the Estate of
Margaret Amundson.

Albert Van Laar, as personal represen-
tative of the Estate of Margaret
Amundson, Plaintiff and Appellant,

v.

David O. Amundson, as personal repre-
sentative of the Estate of Howard
Amundson, Defendant and Appellee.

Nos. 21015, 21016.

Supreme Court of South Dakota.

Argued March 20, 2000.

Decided Feb. 14, 2001.

Timothy J. Langley, Sioux Falls, SD and
Brian J. Stuart of Stuart, Gerry & Schlim-
gen, Sioux Falls, SD, Attorneys for appel-
lant.

Cheryle Wiedmeier Gering of Daven-
port, Evans, Hurwitz & Smith, Sioux Falls,
SD, Attorneys for appellee.

KONENKAMP, Justice

[¶ 1.] Margaret Amundson's estate
challenges the validity of a living trust
created for Margaret by her husband at a
time when she was mentally incapable of
giving consent or exercising the powers
the trust conferred. The trust effectively
bypassed Margaret's estate's right to take
her spousal elective share under South

Dakota law. We conclude that it violated public policy. As the circuit court came to the opposite conclusion, we reverse and remand.

## A.

[¶ 2.] After fifty-four years as husband and wife, Howard and Margaret Amundson both died in 1998. They had no children together, but Howard had a son, Jerry Amundson, from a previous marriage. Howard and Margaret had invested profitably over the years and owned several businesses in Canton, South Dakota. Margaret had been an active participant in the businesses until her health began to decline. Their combined assets were worth in excess of $1.3 million.

[¶ 3.] In their latter years, Howard and Margaret had an especially close bond with Howard's nephew, David O. Amundson, the son of Howard's brother, Owen. Although David had provided assistance to Howard and Margaret on occasion in the past, when David moved back to Canton in 1990, he began providing extensive help, including financial guidance. In 1991, after visiting with a friend about estate planning, Howard obtained material on do-it-yourself wills and trust kits. He asked David for advice. When David reviewed this material nearly two years later, he told Howard that because trusts are complicated an attorney should be consulted to set up an estate plan.

[¶ 4.] In 1992, Howard and Margaret, both in poor health, began residing at the Canton Good Samaritan Center. On March 27, 1992, Margaret gave David a financial power-of-attorney, and her brother, Albert Van Laar, a medical power-of-attorney. On the same date, Howard signed a durable power-of-attorney naming David as his attorney-in-fact. By late 1993, Margaret's physical and cognitive state had severely deteriorated. She was never to leave the nursing home. Howard, on the other hand, returned home in January 1993, under the personal care of a nurse's aid.

[¶ 5.] In the fall of 1993, Howard met with his attorney in Canton to discuss estate planning. After several meetings, the attorney drew separate revocable living trust agreements for Margaret and Howard. The attorney never met with Margaret. Howard provided all the details necessary to create her trust. According to Howard's attorney, these trusts were established so that Howard and Margaret could minimize both state inheritance and federal estate taxes, and provide for their continuing care. Approximately $200,000 was initially placed in Margaret's trust. Howard's trust received $600,000. This appeal centers on the legal propriety of Margaret's trust.

[¶ 6.] In our reading, the terms of her trust instrument are somewhat contradictory. It begins by naming Howard as "Settlor," Margaret as "Primary Beneficiary/Settlor," and David as "initial Trustee." There is no place provided in the instrument for Margaret's signature as Settlor. Her signature, in fact, is nowhere in the document. The instrument declares that "Howard Amundson shall retain no rights or powers over the assets transferred in trust hereunder." However, the "Trustees" are given extensive powers under SDCL ch. 55–1A, and on the signature page Howard is named "Settlor and initial Trustee" along with David as "Co–Trustee."

[¶ 7.] Margaret's trust instrument represents that "The assets transferred in trust consist of [Margaret's] share of the joint assets of the Settlors." The trust gives her a "general power of appointment to direct disposition of all assets," including the power to name beneficiaries and to revoke the trust.[1] Upon Margaret's death,

---

1. SDCL 29A–1–201(36) provides:
   "Power of appointment" means a power to vest absolute ownership in the property subject to the power, whether or not the powerholder then had capacity to exercise the power. "General power of appoint-

the document instructs the trustees to distribute $60,000 of the trust estate to five of Margaret's relatives.[2] The trustees are given discretion to make annual gifts of up to $10,000 per person to these individuals to avoid the requirement of filing a gift tax return. If Howard were still living at the time of Margaret's death, and if funds were not readily available to him from his own revocable trust or from another source, Margaret's trust instructs the trustees to draw from the principal and income of her trust for his "proper care, support, and maintenance." Upon the death of both Margaret and Howard, any amount not otherwise designated by Margaret goes to David.

[¶ 8.] After Howard and David signed the trust documents, Howard's attorney sent copies in January 1994 to Margaret at the nursing home along with a cover letter explaining that she alone held the right to revoke the trust, to change beneficiaries, and to name a different residue recipient upon her death. The problem with this was that although the letter served to formally notify Margaret of the creation of her trust, she was not mentally capable of understanding that one had been created on her behalf. She had been out of touch with reality for some time. She suffered from dementia and was unable to communicate rationally. As she had not been adjudicated legally incompetent, no guardian or conservator had been appointed to act as her representative in accepting or managing her trust. Indeed, although he had never met her, Howard's attorney conceded that it was his feeling when he sent her the trust documents that she probably was not competent. The attorney also

conceded that as a practical matter it was impossible for Margaret to exercise her right of substitution and revocation under the trust.

[¶ 9.] In 1995, David told Howard that the costs of caring for Margaret had depleted the corpus of her trust to approximately $175,000. David suggested that by increasing the amount in the trust, Howard could take greater advantage of the federal tax exemption, and ensure that the trust income would cover Margaret's nursing home expenses. Howard placed funds in the trust from a mining venture that he and Owen had been involved in and recently sold. Howard received approximately $395,000 from this sale and he placed about half of it into Margaret's trust, increasing the corpus to approximately $440,000.

[¶ 10.] Howard died on May 17, 1998. Margaret died eleven days later on May 28. She had no will. At the time of her death, Margaret's trust held approximately $458,000. In preparing the trusts, neither Howard nor his attorney apparently anticipated that Margaret might be in a position to exercise her elective share. Because her health was considered worse than Howard's, Margaret was not expected to outlive him. Margaret's brother, Albert, was appointed the personal representative of her estate. On June 29, 1998, Albert filed a petition for elective share on behalf of Margaret's estate under SDCL 29A–2–212. He later moved to set aside her trust.

[¶ 11.] Margaret's estate argued in circuit court that the trust was invalid and illusory because it allowed Howard to

ment" means a power exercisable in favor of the powerholder, the powerholder's estate, the powerholder's creditors, or the creditors of the powerholder's estate, whether or not the power is also exercisable in favor of others. "Presently exercisable general power of appointment" includes a power to revoke or invade the principal of a trust or other property arrangement, but excludes a power exercisable only by the powerholder's will.

2. Distributions were directed as follows: $25,000 to her brother Albert Van Laar; $10,000 to her sister Gladys Van Laar; $10,000 to her sister Helen Van Laar; $10,000 to her sister Mary Ann Van Laar; and $5,000 to her niece Robin Van Laar, who is the daughter of Margaret's deceased sister, Rosie Van Laar. At about the time the trusts were established, Howard also gave gifts of $5,000 to each of Margaret's siblings.

serve as Margaret's "surrogate testator," naming his nephew, David, as the residuary beneficiary, safe in the knowledge that Margaret was incapable of changing it. In responding to these assertions, Howard's attorney testified that he and Howard had no discussion about elective shares, much less a plan to thwart Margaret's elective share rights. In its findings of fact, the trial court ruled:

> Margaret Amundson's mental condition at the time her trust was created was not good. There is reason to doubt that she ever had the capacity to understand the conditions of the trust so that she could have exercised her right to revoke the trust and appoint new or additional beneficiaries. There is no evidence, however, that Howard Amundson created the trust with the intent of taking advantage of any incapacity on the part of Margaret and thereby defeating her spousal election.

* * *

> There is no evidence that Howard Amundson was ever advised, by counsel or anyone else, that there was an elective share that could be asserted by the spouse who survived the other.

* * *

> There is no evidence that Howard Amundson considered or had any thought of defeating Margaret Amundson's rights to an elective share.

* * *

> The Margaret Amundson trust and the Howard Amundson Trust were set up for tax benefits, and to provide for the care of Margaret Amundson.

The court concluded that it "may or may not have been Margaret Amundson's wish to name the same beneficiaries" because she never expressed a plan for bestowing her assets. Nonetheless, the court declined to invalidate Margaret's trust, holding that her estate did not meet its burden of establishing adequate grounds.

[¶ 12.] Margaret's estate now appeals contending that the circuit court erred in failing to hold (1) that Margaret's trust violates South Dakota public policy on spousal elective shares and intestate succession; (2) that performance of the trust is impossible; and (3) that the trust is fraudulent. We need not reach Issues (2) and (3), as we conclude that under Issue (1) the trust violates a surviving spouse's right to take an elective share, which right may be claimed by a deceased surviving spouse's personal representative under South Dakota's unique version of the Uniform Probate Code (UPC).[3] Margaret's trust was created primarily to provide for her care and minimize death taxes, but it also purported to create a living trust in her name when both her husband and his attorney knew she was not mentally competent to create one for herself, or exercise any of the powers the trust granted.[4]

---

3. After the court heard and disposed of the challenges to the validity of Margaret's trust, the court ruled, in accord with South Dakota's UPC, that Margaret's Estate was entitled to an elective share of 50% of the augmented estate. However, because Margaret had a power of appointment under the trust, the entire value of her trust was charged against her elective share. But her power of appointment was meaningless as we explain below.

4. Under our standard of review, the circuit court's findings of fact can be overturned only if they are found to be "clearly erroneous" in light of all the evidence. *Estate of Dokken*, 2000 SD 9, ¶ 10, 604 N.W.2d 487, 490. Conclusions of law, in contrast, are fully reviewable, as are mixed questions of fact and law. *Schuck v. John Morrell & Co.*, 529 N.W.2d 894, 896 (S.D.1995) (citations omitted). "The credibility of the witnesses, the weight to be accorded their testimony, and the weight of the evidence must be determined by the trial court and we give due regard to the trial court's opportunity to observe the witnesses and the evidence." *In re Estate of Elliott*, 537 N.W.2d 660, 662 (S.D.1995) (citations omitted). Documentary evidence is reviewed under a de novo standard. *Id.* (Citations omitted).

## B.

[¶ 13.] Margaret's estate stresses the circuit court's erroneous understanding of South Dakota law and its misconception of the public policy behind the statutory right to a spousal elective share. It points to two of the court's conclusions: "The central characteristic of an elective share is to benefit the spouse, not the spouse's heirs"; and "Petitioner [Margaret's estate] has failed to show that the Margaret Amundson trust was set up to defeat her elective share." The first finding is an erroneous conception of our present elective share law; the second finding, though possibly accurate, is not germane to the question whether the trust violates public policy.

[¶ 14.] South Dakota's version of the UPC, adopted in 1995, allows a spouse of more than fifteen years to obtain half the augmented estate of the deceased spouse, even when the deceased made provisions to the contrary. *See* SDCL 29A–2–202. The amounts transferred under certain trusts are included in the combined estate of the husband and wife to calculate the augmented estate because "[t]he value of the augmented estate includes the value of the decedent's nonprobate transfers to others . . . ." SDCL 29A–2–205. Although Margaret's trust lists her as a co-settlor, in truth, Howard was the only settlor, as her involvement was nonvolitional.

[¶ 15.] The National Conference of Commissioners on Uniform State Laws designed the revised UPC to achieve several goals, one of the most important of which was the protection of a surviving spouse's right to a "fair share" of the decedent's estate. Unif. Probate Code art. II pt. 2 gen. cmt., 8 ULA 292 (1997). In creating the augmented estate concept, the commissioners embraced the economic partnership theory of marriage. Unif. Probate Code § 2–202, 8 ULA 93 (1997). "The main purpose of the revisions is to bring elective share law into line with the contemporary view of marriage as an economic partnership." Unif. Probate Code rev. art. II, pt. 2, gen. cmt. (1993); 8 ULA 93 (1997). *But see Estate of Karnen*, 2000 SD 32, ¶ 14, 607 N.W.2d 32, 36 ("The goal of our elective share statutes is to protect a surviving spouse from disinheritance, rather than reward him or her for contributions made to the economic partnership of an enduring marriage."). Under the UPC, the augmented estate consists of the sum of the decedent's net probate estate, the value of property transferred to third parties (except bona fide purchasers) over which the decedent retained dominion and control, including revocable trusts, and the surviving spouse's assets. Unif. Probate Code § 2–204, 205, 8 ULA 104–05 (1997). Sixteen states, including South Dakota, adopted the "augmented estate" approach of the revised UPC.[5]

■ [¶ 16.] Two rationales underlie our elective share system: support and contribution.[6] The support theory acknowledges the survivor's financial needs after the death of a spouse. Unif Probate Code (amended 1993), 8 ULA gen. cmt. at 99 (1997). Spouses owe a mutual duty of support during their lives, and after death this duty continues in favor of the survivor in the form of a claim on the decedent's estate. *Antonopoulos*, 993 P.2d at 642

---

5. Alaska; Arizona; Colorado; Florida; Hawaii; Idaho; Maine; Michigan; Minnesota; Montana; Nebraska; New Mexico; North Dakota; South Carolina; South Dakota; and Utah. 8 ULA 1 pt. 1 (Supp. 2000).

6. The right of a spouse to take an elective share was created to prevent disinheritance of the surviving spouse. *Estate of Karnen*, 2000 SD 32, ¶ 14, 607 N.W.2d at 36; *Estate of Antonopoulos*, 268 Kan. 178, 993 P.2d 637, 642 (1999) (citing Volkmer, *Surviving Spouse's Right to Inherit*, 21 Est. Plan 58 (1994)); *Mongold v. Mayle*, 192 W.Va. 353, 452 S.E.2d 444, 446 (1994) (citing John W. Fisher II & Scott A. Curnutte, *Reforming the Law of Intestate Succession and Elective Shares: New Solutions to Age–Old Problems*, 93 WVaLRev 61, 98–115 (1990) ("[T]he protection of a decedent's wife from disinheritance began as early as the Code of Hammurabi, and can be traced through Roman, Germanic, Scandinavian and Saxon Law.")) (citations omitted).

(citations omitted). Under this rationale, the length of the marriage is irrelevant because the duty of support is based on status and originates when the marriage is created. *Id.;* Unif. Probate Code (amended 1993), 8 ULA gen. cmt. at 99 (1997). The 1990 UPC incorporates the support theory into its elective share arrangement by providing for a supplemental elective share amount that applies regardless of the length of the marriage. Unif. Probate Code art. II, pt. 2, § 2–202(b); 8 ULA 99 (1997).

[¶ 17.] The second theory, contribution, recognizes the assistance of the surviving spouse in acquiring assets. Unif. Probate Code (amended 1993), 8 ULA gen. cmt. 93 (1997). Each spouse possesses rights under an "unspoken marital bargain" to share the "fruits of the marriage." *Antonopoulos,* 268 Kan. 178, 993 P.2d 637, 642 (1999). The elective share compensates a surviving spouse when the deceased disinherits his or her "partner." *Id.* (Citations omitted). Assuming that the longer the "partnership" the greater the contribution, a sliding scale proportions the surviving spouse's share based on the length of marriage. *See* SDCL 29A–2–202.

[¶ 18.] The partnership theory of marriage was not so fully embraced by the drafters of the UPC that it applies in the event a surviving spouse dies during the administration of the deceased spouse's estate without having decided to take an elective share. If a surviving spouse dies during the administration of the predeceased spouse's estate without having made the election, under the UPC the personal representative of the surviving spouse's estate may not make the election on his or her behalf. *See* Unif. Probate Code § 2–212(a), 8 ULA at 126. As the comments to 2–212 explain, "Subsection (a)

is revised to make it clear that the right of election may be exercised only by or on behalf of a living surviving spouse.... In any case, the surviving spouse must be alive when the election is made. The election cannot be made on behalf of a deceased surviving spouse." 8 ULA at 128.

[¶ 19.] In contrast, South Dakota is unique among the states adopting the UPC. Our Legislature took the marital contribution-partnership theory a step further: it allowed an election by the personal representative of a deceased surviving spouse. SDCL 29A–2–212. Under the predecessor statute, the right of election could be "exercised only during the lifetime of the surviving spouse." *See* SDCL 30–5A–3 (repealed). Effective July 1, 1995, however, the law provides:

> The right of election may be exercised either by the surviving spouse or by the surviving spouse's conservator or agent under the authority of a power of attorney, or if the surviving spouse dies prior to the expiration of the time for making an election under § 29A–2–211, by the surviving spouse's personal representative.

SDCL 29A–2–212. This was a distinct departure from the UPC approach. To our knowledge, no other jurisdiction has broken with the UPC version in this regard. We are thus left to discern our Legislature's purpose without guidance from other UPC jurisdictions. When deciding statutory intent, we presume that the Legislature had in mind previously enacted statutes on the subject.[7] *Estate of Smith,* 401 N.W.2d 736, 740 (S.D.1987) (citing *State v. Chaney,* 261 N.W.2d 674 (S.D. 1978)).

[¶ 20.] Allowing the personal representative of the deceased surviving spouse to

---

**7.** SDCL 30–5A–3 was based on section 203 of the Uniform Probate Code. It was repealed by 1995 SD Laws ch. 167, § 148. Elective share provisions were first enacted when South Dakota adopted the Uniform Probate Code (UPC). 1974 SD Laws ch. 196; *Estate of Smith,* 401 N.W.2d 736, 737 (S.D.1987).

The UPC was repealed in 1976. *Id.* Separate elective share provisions were then enacted in 1980. *Id.* 1980 SD Laws ch. 205 (codified at SDCL ch. 30–5A). On July 1, 1995 South Dakota's current UPC became effective. SDCL 29A–1–101.

make the election acknowledges the durability of the contributions made by the surviving spouse to the acquisition of assets during the marriage. Even after a surviving spouse's death, the estate can make the election on behalf of the deceased surviving spouse, thus permitting the heirs to reap the contribution the spouse earned in the marital partnership. Logically, the estate could not make the election if during the surviving spouse's lifetime he or she legally waived the right to elect or consented to exclude certain assets through the creation, for example, of nonprobate transfers such as living trusts.[8] *See* SDCL 29A–2–213 (right of election may be relinquished by written contract, agreement, or waiver signed by the surviving spouse.) Here, of course, Margaret did not choose to place her share of the marital assets in trust or choose her beneficiaries. Those decisions were made for her at a time when she was mentally incapable of understanding or exercising her rights.

### C.

[¶ 21.] Margaret's estate argues that the trust Howard created for Margaret had as its purpose the evasion of her elective share. Howard's estate counters that the trust was created to provide for Margaret's care and to take advantage of estate tax exemptions, not to defeat Margaret's right to take an elective share. The trial court specifically found that the trusts were created to minimize death taxes and to provide caretaking for Margaret and Howard, with no intent to preclude Margaret's elective share. Regardless,

these arguments derive from cases decided in non-UPC jurisdictions where the courts were dealing with revocable living trusts assertedly used to defeat a spouse's elective share. *See Dunnewind v. Cook*, 697 N.E.2d 485 (Ind.App.1998); *Seifert v. Southern Nat'l Bank*, 305 S.C. 353, 409 S.E.2d 337, 338–39 (1991) (living trust was "illusory," and therefore invalid, where grantor defeated spousal elective share by removing property from estate while retaining control over assets in trust); *Moore v. Jones*, 44 N.C.App. 578, 261 S.E.2d 289, 292 (1980) (finding trust invalid where settlor retained powers over trust assets so extensive that he retained same rights after creating trust that he had prior to its creation). In the *Dunnewind* case, the court found that the "sole purpose" of the trust was to defeat the spouse's statutory elective share. *Dunnewind*, 697 N.E.2d at 487, 490. In states that still apply the elective share to the probate estate only, as opposed to nonprobate transfers, assets held in such trusts avoid the reach of the spousal elective share. *See Soltis v. First of America Bank–Muskegon*, 203 Mich.App. 435, 513 N.W.2d 148, 151 (1994). *Johnson v. La Grange State Bank*, 73 Ill.2d 342, 22 Ill. Dec. 709, 383 N.E.2d 185 (1978). In those jurisdictions, therefore, certain trusts can be facile devices for defeating elective share rights.[9]

[¶ 22.] Our case is not analogous to these non-UPC decisions because they come from jurisdictions that do not recognize the "augmented estate" approach of

8. In some states that require the surviving spouse to make the election personally during his or her lifetime, once the surviving spouse dies, unexpended property is returned to the predeceased spouse's estate to be distributed. *See e.g.* Mont. Code Ann. § 72–2–223(c) (1999); N.D.Cent.Code § 30.1–05–06(c) (1996); Utah Code Ann. § 75–2–212(c) (2000 Supp.); W.Va.Code § 42–3–3 (2000 Supp.).

9. In *Dunnewind,* the court invalidated an otherwise facially valid trust. There, the wife executed a trust leaving all her property to

her children from a prior marriage after she learned she had terminal cancer and had only a short time to live. *Dunnewind,* 697 N.E.2d at 487. The court held the trust failed to defeat the spouse's share because it was executed in contemplation of impending death for the sole purpose of defeating her husband's statutory rights to her assets as a surviving spouse. *Id.* at 490. The court returned the assets to the wife's estate to be subject to the elective share petition of the surviving husband. *Id.*

the UPC.[10] In those states, the law allows the surviving spouse a share only from the probate estate and a "valid inter vivos trust does not pass under the laws of descent and distribution and thus does not become part of the decedent's probate estate." *Dunnewind,* 697 N.E.2d at 488 (citations omitted). In states that retain traditional forced share statutes, courts employ various equitable rules in a case-by-case inquiry into the testator's use of various will substitutes: under this approach property transferred out of the estate is considered part of the probate estate if the conveyance is "illusory," or if the decedent "intended to defraud" the surviving spouse of his or her marital right in the estate, or if the decedent lacked "present donative intent" with respect to the transfer. In *Newman v. Dore,* 275 N.Y. 371, 9 N.E.2d 966, 968 (1937), for example, the court used the illusory purpose test to decide if a trust was invalid as a device to disinherit the wife. *See also* Theresa A. Smyth, The Use of an Intervivos Trust to Circumvent an Elective Share, 9 PROBLJ 207, 229 (1989).

[¶ 23.] On the other hand, in South Dakota, for elective share purposes, a decedent's nonprobate transfers of marital property are by statute automatically part of the augmented estate.[11] SDCL 29A–2–204; SDCL 29A–2–205. Therefore, no equitable balancing or other remedy is necessary or appropriate to determine if trust

assets are to be included in the augmented estate. As one commentator explained, under the revised UPC, by including the value of will substitutes in the augmented estate, these devices cannot be used to defeat the purpose of the elective share: "by preventing this 'fraud' mechanically, the uncertainty produced by a judicial 'balancing of the equities' after the fact is avoided." John W. Fisher II & Scott A. Curnutte, *Reforming the Law of Intestate Succession and Elective Shares: New Solutions to Age–Old Problems,* 93 WVaLRev 61, 108–109 (1990) (internal quotations in original).

### D.

■ [¶ 24.] Margaret's estate underscores the absence of any indication that Margaret knew of her trust or the powers it gave her, though it was a trust purportedly created by her as a co-settlor. The argument is that Howard effectively took advantage of her deteriorated mental condition to achieve his personal estate plan and deprive his wife of her right to an elective share. Yet the trial court found that there was no evidence of such a scheme. Howard was concerned with saving the estate from substantial federal estate taxes. Howard's attorney testified that they had no discussion about elective shares. On the contrary, it was assumed that Howard would outlive Margaret, and if she passed away without a tax savings

---

10. The augmented estate approach of the revised UPC remedied the problem under the old forced share laws where the elective share could be easily circumvented by using inter vivos transfers. "Because most forced share statutes calculate the spouse's share as a fraction of the probate estate, a testator may substantially reduce the amount that the surviving spouse can receive by utilizing various will substitutes such as life insurance policies, employee benefit plans, joint and survivor annuities, joint tenancies, joint bank accounts, Totten trusts, P.O.D. accounts, and revocable inter vivos trusts, in order to deplete the probate estate. Thus, by failing to take will substitutes into account in the calculation of the surviving spouse's share, forced share statutes invite attempts at evasion through the use of

these devices." John W. Fisher, II and Scott A. Curnutte, REFORMING THE LAW OF INTESTATE SUCCESSION AND ELECTIVE SHARES: NEW SOLUTIONS TO AGE OLD PROBLEMS, 93 WVaLR 61, 102–03 (1990)(footnoted information omitted). Under the revised UPC "[a] more predictable result is achieved by a forced share statute which mechanically takes into account will substitutes." *Id.* at 99.

11. Despite the changes in the UPC to the contrary, South Dakota continues to charge the surviving spouse's elective share with the commuted value of a life estate, even if it is disclaimed. *See Estate of Karnen,* 2000 SD 32, ¶ 15 n. 5, 607 N.W.2d at 37; SDCL 29A–2–209(2).

plan in place, all the marital assets would be in Howard's estate for him to bequeath as he wished, subject to the full amount of death taxes.

[¶ 25.] A long line of federal cases hold that for estate tax purposes, so long as a granting instrument creates a general power of appointment *exercisable* in favor of the grantee, the power is sustainable regardless of the grantee's inability to exercise such power because of incompetence. *See Estate of Gilchrist v. Commissioner*, 630 F.2d 340, 345 (5th Cir. 1980); *Boeving v. United States*, 650 F.2d 493, 495 (8th Cir.1981); *Williams v. United States*, 634 F.2d 894 (5th Cir.1981); *Estate of Rosenblatt v. Commissioner of Internal Revenue*, 633 F.2d 176, 179–80 (10th Cir.1980); *Estate of Alperstein v. Commissioner of Internal Revenue*, 613 F.2d 1213, 1221 (2ndCir.1979), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980); *Pennsylvania Bank & Trust Co. v. United States*, 597 F.2d 382, 383 (3rd Cir.1979), *cert. denied*, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979); *Fish v. United States*, 432 F.2d 1278 (9th Cir. 1970). These cases acknowledge the primacy of state law in deciding the validity of trusts, however.

[¶ 26.] The distinction between these federal cases and the one before us is that Margaret's trust was formed by those who knew at the time the trust was created that she was incapable of exercising the powers conferred upon her, including the power to change beneficiaries. Since Margaret had no guardian or conservator appointed for her, those powers could not be exercised on her behalf. In the federal cases, there was no evidence that the trusts were created by those who knew beforehand that the donees would never be able to exercise the rights given to them. Here, in contrast, although the purpose of Margaret's trust may not have been to defeat her elective share, Howard effectively directed the course of the assets held in Margaret's nominal control because she could not exercise her power over the property, and both Howard and his attorney knew it. A trust must terminate if its "purpose becomes unlawful or impossible to fulfill...." SDCL 55–3–23(3). *See also* Restatement of Trusts (Second) § 62. In purposely bypassing Margaret's knowing participation in the distribution of marital assets, the trust Howard created for her violated South Dakota's spousal elective share policy. Therefore, the trust is invalid and must be terminated.

### E.

[¶ 27.] Both sides seek an award of attorney fees. SDCL 15–17–38; 15–26A–87.3. On Margaret's estate's request, we remand to the circuit court for determination of a proper award. *See Estate of Hafferman*, 442 N.W.2d 238, 242 (S.D. 1989).

[¶ 28.] Reversed and remanded.

[¶ 29.] MILLER, C.J., and SABERS, AMUNDSON, and GILBERTSON, JJ., concur.